**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MICHAEL L. FERGUSON, | : | Civil Action No. |
| MYRL C. JEFFCOAT and DEBORAH SMITH, | : | |
| individually and as representatives of a class of | : | |
| similarly situated plan participants and | : | |
| beneficiaries, and on behalf of the | : | |
| DST SYSTEMS, INC. 401(K) PROFIT | : | **CLASS ACTION COMPLAINT** |
| SHARING PLAN, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| ROBERT D. GOLDFARB | : | August 31, 2020 |
| | : | |
| Defendant. | : | |

## INTRODUCTION

1.     Plaintiffs, Michael L. Ferguson ("Ferguson"), Myrl C. Jeffcoat ("Jeffcoat")

and Deborah Smith ("Smith") (collectively, "Plaintiffs"), individually and as representatives of

a class of similarly situated plan participants and beneficiaries,[1] and on behalf of the DST

Systems, Inc. 401(k) Profit Sharing Plan (the "Plan"), bring this action under 29 U.S.C. §1132

against Defendant, Robert D. Goldfarb ("Goldfarb" or "Defendant"), for breach of fiduciary

duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1001, *et seq*.  Contrary to his fiduciaries duties -- *inter alia*, loyalty, prudence, and

diversification -- Goldfarb mismanaged Plan assets, resulting in significant losses to the Plan.

2.     The Plan is a defined contribution plan ("DC") that, at all relevant times, had

---

[1]The proposed class excludes any plan participant or beneficiary who has ever been a member of the Advisory Committee of the DST Systems, Inc. 401(k) Profit Sharing Plan ("Advisory Committee") or the Compensation Committee of the Board of Directors of DST Systems, Inc. ("Compensation Committee") or otherwise served as a fiduciary of the DST Plan during the Class Period (defined below).

two components: (1) the Profit Sharing Account ("PSA"), in which DST Systems, Inc. ("DST"),[2] the Plan sponsor and administrator, made contributions on behalf of its employees and delegated sole and exclusive responsibilities for investment management to Ruane, Cunniff & Goldfarb Inc. ("Ruane" or "RCG"), for which Goldfarb served as principal; and (2) an employee-directed portion that is more typical of modern 401(k) plans, containing menu of mutual funds and similar investment options from which participants choose to invest and for which the Plan and its fiduciaries disclaim responsibility beyond the creation and maintenance of the overall menu of investment options and certain other elements, such as the reasonableness of fees and expenses. With more than $1 billion in assets, the Plan is in the top one percent (1%) of 401(k) plans in the country in terms of assets.

3. DC plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code ("IRC"), 26 U.S.C. §§ 401(a) and (k) (*i.e.*, 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit ("DB") retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment under-performance.

4. Personal savings accounts in the form of 401(k) and other DC plans have become the primary method for employees in the United States to save for retirement in recent years. The importance of DC plans to the United States retirement system has become

---

[2]DST, the Advisory Committee, and the Compensation Committee are defendants in a related case, *Ferguson, et al. v. Ruane, Cunniff & Goldfarb, et al.*, 17-cv-06685 (S.D.N.Y.) (the "*Ferguson* Action").

increasingly pronounced as employer-provided DB plans have become exceptionally rare as an offered and meaningful employee benefit.

5.    The PSA was established in the early 1970s, before the advent of 401(k) plans, which occurred with an amendment to the IRC in 1978.  Soon after the PSA was established, DST appointed Ruane to serve as the PSA's investment manager, which Ruane managed through a separately managed account until July 31, 2016.  As explained below, at all relevant times, the PSA was treated by DST and Ruane as a unitary investment vehicle -- separate and apart from 401(k) elements of the Plan and without regard for regard for or consideration of the investment components contained in the participant-directed portion of the Plan.

6.    As a fiduciary to the Plan, Goldfarb was obligated to act for the exclusive benefit of participants and invest the assets of the Plan in a prudent fashion.  At all pertinent times, as explained below, Defendant (a) was a fiduciary under ERISA, and (b) breached his fiduciary duties under ERISA in myriad significant ways, to the extreme detriment of the Plan and its participants.

7.    Ruane, which was managed by Goldfarb throughout most of the pertinent period along with other RCG employees and principles, pursued an exceptionally imprudent investment strategy with respect to a significant portion of the Plan's assets (which he invested without any input or oversight by participants in the Plan).  As a direct result and consequence of these imprudent investment decisions and related misconduct, the Plan (and, as a result, its participants) has suffered losses in excess of $100 million.

8.    To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this action individually and as representatives of a class of similarly situated plan participants and beneficiaries, on behalf of the Plan under Section 502, 29 U.S.C. §1132, and

Section 409 of ERISA, 29 U.S.C. §1109, to recover and obtain all losses suffered by the Plan and its participants resulting from each breach of fiduciary duty, prohibited transaction and other violation of ERISA; to restore to the Plan any profits made through Defendant's use of the Plan's assets; and for disgorgement with respect to all fees and compensation received by Defendant in connection with any prohibited transaction.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate and just under all of the circumstances.

9.     Plaintiffs specifically bring this action on behalf of the Plan under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment holding that the acts of Defendant described herein violate ERISA and applicable law;

- A permanent injunction against Defendant prohibiting the practices described herein;

- Disgorgement and/or restitution of all payments and other compensation improperly received by Defendant, or, alternatively, the profits earned by Defendant in connection with their receipt of such unlawful payments and other unlawful compensation;

- Compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## THE PARTIES

10.     Plaintiff, Michael L. Ferguson ("Ferguson"), is a participant under 29 U.S.C. §1002(7) of the Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).  Ferguson is a resident of Buckner, Jackson County, Missouri.

11.     Plaintiff, Myrl C. Jeffcoat ("Jeffcoat"), is a participant under 29 U.S.C.

4

§1002(7) of the Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34). Jeffcoat is a resident of Rancho Cordova, Sacramento County, California.

12.    Plaintiff, Deborah Smith ("Smith"), is a participant under 29 U.S.C. §1002(7) of the Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34). Smith is a resident of Glastonbury, Hartford County, Connecticut.

13.    The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102, and serves as a vehicle for retirement savings and to produce retirement income for employees of DST and certain of its subsidiaries and affiliates, including, but not limited to, ALPS Advisors, Inc.; ALPS Fund Services, Inc.; Argus Health Systems, Inc.; Converge Systems, LLC; DST Brokerage Solutions, LLC; DST Direct, LLC; DST Global Solutions NA, LLC; DST Health Solutions, LLC; DST Mailing Services, Inc.; DST Market Services, LLC; DST Output, LLC; DST Output Central, LLC; DST Output East, LLC; DST Output West, LLC; DST Output Electronic Solutions, Inc.; DST Systems of California, LLC; DST Realty, Inc.; DST Realty of California, Inc.; DST Retirement Solutions, LLC; DST Technologies, Inc.; DST Worldwide Services, LLC; Finix Professional Services, LLC; Lateral Group NA, LLC; LTM Publishing, Inc.; MC Realty Group, LLC; McKay Hochman Co., Inc.; National Financial Data Services, Inc. d/b/a BFDS Midwest; Newkirk Products, Inc.; and ThirdParty Educational Systems, Inc. (the "DST Affiliates"). DST is hereafter referred to individually and/or collectively with the DST Affiliates, as may be applicable, as "DST" or the "Company." Retirement income generated by the Plan depends upon contributions made on behalf of each employee by the Company, deferrals of employee compensation and employer

matching contributions, and from the performance of investment options (net of fees and expenses) exclusively controlled by the fiduciaries of the Plan.  DST established a trust (the "Trust") to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee to carry out the purposes of the Trust, in accordance with 29 U.S.C. §1103.  As of December 31, 2014, the Plan was one of the country's largest 401(k) plans, with more than $1.4 billion in total assets and over 9,400 participants with account balances.  As of December 31, 2015, the Plan had over $1.3 billion in total assets and more than 9,500 participants with account balances.  As of December 31, 2016, the Plan had over slightly over $1 billion in total assets (a decline in value of over $300 million from the year before) and more than 10,000 participants with account balances.  As of December 31, 2016, over 20% of Plan participants were either retired from DST or otherwise not employed by DST.  As of December 31, 2017, the Plan had over slightly over $1.4 billion in total assets and more than 10,000 participants with account balances.  As of December 31, 2017, over 30% of Plan participants were either retired from DST or otherwise not employed by DST.  As of December 31, 2018, the Plan had over $1.15 billion in total assets and more than 9,000 participants with account balances.

14.    Defendant, Robert D. Goldfarb, was Chairman and Chief Executive Officer of Ruane[3] throughout most of the pertinent period and until his retirement on March 31, 2016.  In

---

[3]Ruane, a defendant in the *Ferguson* Action, provided investment services to both individual and institutional clients, maintaining both separately managed accounts and a registered investment company, the Sequoia Fund, Inc. (the "Sequoia Fund").  At all relevant times, until July 31, 2016, Ruane was the investment manager to the PSA using a separately managed account.  Ruane was terminated as the investment manager of the PSA in 2016 as a result of the extraordinary breaches of fiduciary duty described herein, relating to investments in Valeant Pharmaceuticals International Inc., n/k/a Bausch Health Companies Inc. ("VRX" or "Valeant" or "Valeant Pharmaceuticals").

addition, Goldfarb was the portfolio manager of the PSA at Ruane. In his capacity as portfolio manager of the PSA, Goldfarb had decision-making authority regarding investment selection and Ruane's monitoring of the PSA. As such, at all relevant times, Goldfarb was a fiduciary of the Plan under ERISA §§ 3(21)(A)(i) and (iii). Because of his role as a fiduciary of the Plan, and as service provider to the Plan, Goldfarb was also a party in interest pursuant to ERISA §§3(14)(A) and (B).

## JURISDICTION AND VENUE

15.    Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132.

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

17.    Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Defendant is a resident of New York, New York, within this judicial district; at all pertinent times, Defendant conducted his business and provided services to the Plan from the offices of Ruane in New York, New York, within this judicial district; and a majority or a significant number of the acts and omissions giving rise to this action and the losses suffered by the Plan arose and were directed from this judicial district.

## GENERAL ALLEGATIONS

### A.    The Composition of the Plan and the PSA

18.    At all pertinent times, the Plan consisted of two components: a 401(k) portion, which is participant-directed, and the PSA, in which the assets were invested by the Trustee of

the Plan, as advised by an investment advisory firm (*i.e.*, RCG) selected and monitored by the Advisory Committee; *i.e.*, the assets are not participant-directed.  Until December 31, 2014, the DST Plan also included an investment option that permitted participants to invest in DST stock (the "Company Stock Fund").  The Plan terminated the services of Ruane on or about July 31, 2016 and the PSA was terminated shortly thereafter, at which time all of the assets of the PSA were transferred to investments in the Plan's more typical 401(k) -- *i.e.*, participant directed -- components.

19.    This arrangement, in which the PSA was not participant-directed, is extremely unusual (since profit sharing assets almost always are participant directed), and resulted in the entire Plan or, at a minimum, that PSA portion of the Plan losing the protection of Section 404(c) of ERISA.  Until the PSA was terminated in or about late 2016, a significant percentage of participants in the Plan were invested only in the PSA and were not invested in the 401(k) portion of the Plan.

20.    The PSA was structured by DST to provide a projected level of benefits through contributions by the Company invested in a manner that DST, the Advisory Committee, and Ruane -- under the direction of Goldfarb -- had supposedly determined would achieve a desirable, aggressive, long-term rate of return.  In essence, this was an investment strategy akin to that of a DB plan, without the obligation for the Company to make any contributions in the event of an investment return short-fall or provide any guaranteed benefit.  As detailed below, the assets of the PSA were invested in a reckless and imprudent manner by Ruane, to the severe detriment of the Plan (and thereby, its participants), which has suffered losses in excess of $100 million as a result of the breaches of duty detailed in this Complaint.  In sum, with respect to the retirement savings of Plan participants, as detailed below, Goldfarb gambled

with these Plan assets by failing to appropriately diversify the investment of the Plan's assets and pursuing risky, inappropriate investment strategies.  In addition, Plan participants were not provided with meaningful and timely guidance regarding the nature of the investments held in the PSA or any specific or meaningful and timely information regarding the investment objectives or investment components of the PSA.

21.    With respect to the PSA portion of the Plan, Ruane oversaw over one-third of the Plan's employee retirement assets in an opaque, high-cost, high-risk, long-term investment strategy.  While the Plan purports to be designed to obtain the protections of Section 404(c) of ERISA and, under Section 404(c), Plan fiduciaries may be relieved of liability for poor investment decisions made by Plan participants, at a minimum and at all pertinent times, the investments in the PSA did not qualify for Section 404(c) protection because DST, the Advisory Committee, and Ruane directly or indirectly controlled these investments with absolutely no participant input or control.  As detailed further below, at all pertinent times, Ruane managed and controlled the investments contained in the PSA in an unfettered and effectively unsupervised manner and pursued an investment strategy with respect to the PSA that was exceptionally reckless and imprudent, and demonstrated an absence of knowledge, appreciation or expertise as to how retirement funds should be managed and invested.

22.    Participants in the Plan were prevented from receiving meaningful information regarding the investment objectives of the PSA.  Participants did not receive regular updates or meaningful information regarding the investment objectives of or the securities or other investments contained in the PSA.  Instead, participants in the Plan simply received periodic, post-hoc reports regarding the performance of the PSA that provided generalized information regarding the return (or lack thereof) achieved in connection with the investment of the PSA.

Although Plan participants were permitted to obtain additional information regarding the
retrospective performance of the PSA of a limited nature in more recent years, Plan
participants literally had no means to monitor the current investments contained in the PSA in
order to otherwise diversify their retirement investments based upon the current and existing
investments in the PSA -- about which participants literally received no meaningful disclosure
or information.

23.     The limited information provided to Plan participants regarding the investment
objectives of the PSA bordered on the absurd.  Specifically, the information provided regarding
the PSA's investment objectives simply stated that the PSA had an investment objective "to
achieve positive growth over the long term."  That generic description of the PSA's investment
objective, provided absolutely no guidance or insight regarding the investment strategy or
investment components of the PSA.  Moreover, there were no asset class limitations or other
restrictions or guidelines imposed with respect to the investments contained in the PSA, and
none of the information provided to Plan participants contained a meaningful description of the
investment objectives of the PSA or the existence (or lack thereof) of any asset class
limitations or other investment restrictions or guidelines.  Instead, participants were provided
with the essentially meaningless information that the PSA sought to achieve positive growth
over the long term, which characterizes virtually every retirement investment of any kind.
Ironically, with respect to the non-PSA portion of the Plan, company fiduciaries consistently
advised participants that they should not invest in any of the investments chosen by the
Advisory Committee as available investments (*i.e.*, mutual funds) without first carefully
reading the prospectus associated with the investment.  But, in the case of the PSA, in which
over one-third of the Plan's assets were invested, there was no ability on the part of Plan

participants to obtain timely or meaningful information.  Thus, at all pertinent times, participants were effectively prevented from obtaining any information regarding the current investments or holdings of the PSA.

24.     Even if DST and the Advisory Committee had fully disclosed to Plan participants the investment objectives, strategies and portfolio holdings of the PSA (which, as discussed above and below, they did not), participants could not properly diversify their retirement investments by simply eliminating risks related to the PSA by diversifying the other two-thirds of their retirement assets.  That is because the PSA constituted such a significant portion of the Plan's investments and assets that participants did not have a meaningful opportunity or means to properly diversify their retirement investments in the Plan, given the dominance of the PSA within the Plan.  The Trustee of the Plan specifically advised participants to avoid over-concentration by investing retirement assets in one industry or security with more than 20% of their retirement assets contained in the non-PSA portion of the Plan.  Amazingly, as discussed below, Ruane utterly failed to heed this same advice and, as a result, lost over $100 million in Plan assets by failing to adequately diversify the PSA.

25.     At all pertinent times, there was absolutely no transparency with respect to the investments in the PSA or the risk level that Ruane pursued in connection with the investments in the PSA.  When participants inquired as to the investment strategy of the PSA and/or the nature of the investments held in the PSA, the Company responded that participants should not worry because "the Company invests this for you."  At times, certain participants in the Plan were told that the PSA was operated by Ruane effectively as a clone of its flagship Sequoia Fund -- but any such information also was untrue because, as detailed below, Ruane shockingly engaged in a more risky investment strategy with respect to the PSA (designed

11

solely for retirees) than the Sequoia Fund itself (designed for high net worth individuals and other sophisticated investors).

**B.    Ruane's Investment Strategy**

26.    Ruane's investment strategy, which it employed on behalf of all clients -- whether appropriate or not -- was centered on non-diversification.  Specifically, Ruane invested on a very concentrated basis in a small number of securities with a long-term horizon.

27.    Ruane's Forms ADV, Part 2, which the firm filed with the U.S. Securities and Exchange Commission, stated that its investment strategies included "Focused Portfolio/Non-diversification," meaning that Ruane "focuses its investments on a limited number of issuers *and does not seek to diversify investments among types of securities, countries or industry sectors* . . . ." (emphasis added).  Ruane used this strategy for all of its clients, both ERISA and non-ERISA, and regardless of what percentage of a client's assets it managed.

28.    Ruane also invested in the same securities for all of its clients.  Because separately managed accounts are not subject to certain concentration restrictions that applied to the Sequoia Fund, the separately managed accounts, such as the PSA, were, at times, even more concentrated than the Sequoia Fund.  Indeed, Ruane consistently maintained heavily concentrated positions in a number of individual securities in the PSA.

**C.    Investment Management of the PSA
    and the Relationship between Ruane and DST**

29.    DST has a significant financial services/investment advisory business itself -- with DST's financial services/investment advisory business contributing almost 50% of its revenues.  It appears that many of the investment managers retained by DST to manage 401(k) assets have business relationships with DST.  Moreover, the sole investment manager selected by the Advisory Committee to manage the PSA, Ruane, has had a relationship with the

Company that "goes back decades-to the 1980s [and, it appears, even earlier]."

30.    The Plan's Summary Plan Description ("SPD") advised participants that "[a]ll Profit Sharing Contributions made by the Employer to the Plan on your behalf will be invested by the Trustee as advised by Ruane, Cunniff & Goldfarb, Inc., the investment adviser selected by the Advisory Committee to manage these funds" and "[y]ou may not direct the investment of these funds into other investment alternatives."

31.    Ruane is an investment advisory firm which has managed the historically successful Sequoia Fund for decades. Ruane's founder and Berkshire Hathaway's Warren Buffett had a longstanding personal relationship -- Buffett referred clients to Ruane's Sequoia Fund when he closed his investment partnership in 1969 and the Sequoia Fund, since first buying Berkshire Hathaway stock about 20 years ago, has made it a major holding.

32.    DST serves as the registrar and shareholder servicing agent for the Sequoia Fund. DST provides investor recordkeeping, performance communications and other information to shareholders of the Sequoia Fund and has other administrative responsibilities with respect to the Sequoia Fund. Ironically, while the Sequoia Fund is fully transparent to investors due, in part, to DST handling shareholder communications, the PSA (which was supposed to "mirror" the Sequoia Fund in a separate account, even though the status of the PSA as a supposed "clone fund" of the Sequoia Fund was never disclosed to Plan participants) was highly opaque. Since the Sequoia Fund was designed as an investment vehicle for high net worth individuals with ample funds to gamble and lose, the decision by Ruane to purportedly mimic the investments of the Sequoia Fund in the PSA was reckless and imprudent because they gave absolutely no consideration to the fact that the PSA contained retirement funds and, therefore, the investment objectives of the PSA necessarily should be

tailored to recognize that plain fact.  As explained below, Ruane did not, in fact, operate the PSA as a clone of the Sequoia Fund and, instead, actually took greater risks with the retirement assets in the PSA than the assets of high net worth investors in the Sequoia Fund.

33.    Given the longstanding financial relationship between DST and the Sequoia Fund, the arrangement between DST and Ruane raises significant self-dealing concerns under ERISA.  Both DST and Ruane are ERISA fiduciaries and, as such, each is prohibited from using the Plan's assets in its own interests.  Here, however, Ruane's cornerstone Sequoia Fund paid compensation to DST and the Plan paid compensation to Ruane, to support the Sequoia Fund's investment strategies.

34.    During its time as the investment adviser to the PSA, Ruane charged the Plan a 1% "flat" fee to manage the PSA.  The 1% flat fee paid to Ruane to separately manage the PSA was grossly excessive at all pertinent times.  That fee is the same fee that RCG charges retail investors in the Sequoia Fund.  Flat fees for traditional asset management mandates are exceptionally rare.  Indeed, Ruane's Forms ADV, Part 2, indicates that, for managed accounts, the Adviser "typically" charges a 1% fee, but that "fees may be negotiable under certain circumstances or for certain managed account clients."  The fees being paid to Ruane were grossly excessive under all of the circumstances, resulting in the Plan paying millions of dollars in excessive fees to Ruane.  Indeed, between 2010 and 2016, Ruane was paid over $35 million in investment management fees by the Plan with over $25 million of such fees paid directly by Plan participants.

35.    Ruane also engaged in self-dealing with respect to substantially all securities transactions on behalf of the PSA.  RCG's Forms, ADV Part 2, state that Ruane and one of its supervised persons receive compensation in connection with the purchase and sale of

14

substantially all securities through Ruane's affiliated broker-dealer.  There is absolutely no benefit to the Plan from permitting this self-dealing arrangement involving substantially all of the PSA's trading activity, which only benefits Ruane -- and its principals, such as Goldfarb -- fiduciaries duty-bound to act in the best interests of the Plan, and effectively results in the Plan paying Ruane even more excessive and unreasonable compensation.

**D.    <u>The Valeant Investment</u>**

36.    As participants in the Plan belatedly learned, Ruane shockingly invested an enormous and imprudent amount of the PSA in the stock of Valeant Pharmaceuticals.

37.    In or about April, 2010, Ruane began purchasing shares of Valeant on behalf of the PSA.  By December 31, 2010, Ruane had purchased a total of approximately 1,572,207 shares of Valeant on behalf of the PSA.  By March 31, 2011, the value of Valeant stock in the PSA had grown to 15% of the total value of the PSA and was the single largest investment held by the PSA.  By no later than March 31, 2011, Ruane -- and Goldfarb and his RCG team in particular -- should have been carefully monitoring the investments in Valeant based upon these high concentration levels, but no such monitoring or evaluation of the investments in VRX ever occurred until 2015, if at all.  According to the Plan's financial statements at year-end 2014, the PSA held approximately $225 million of VRX in non-participant directed assets, or almost 30% of its assets in 1,572,207 shares of Valeant, with a cost of $38.2 million.  According to published reports, as of June 2015, the Sequoia Fund held approximately 35% of its assets in Valeant.  Indeed, at times, VRX accounted for almost 50% of the value of the PSA.

38.    A number of participants in the Plan (almost 20%) maintained 100% of their retirement investments in the PSA, with no investments in the 401(k) portion of the Plan.  At

no time did Ruane ever take any action to examine the investments in the 401(k) portion of the

Plan for purposes of examining the Plan as a whole, including the PSA investments, for

diversification purposes.  Instead, at all pertinent times, the PSA was treated as a unitary

investment fund by Ruane.

39.     Goldfarb and Ruane were fiduciaries of the Plan under ERISA.  Their

investment of more than 30% percent (and, at times, almost 50%) of the PSA's assets in

Valeant stock constituted a significant and shocking breach of fiduciary duty, since Goldfarb

and Ruane failed to adequately diversify its investments in the PSA and otherwise breached

their fiduciary duties by concentrating the PSA in one high-risk investment.

40.     The 52-week high of Valeant stock placed the PSA's interest in VRX at an

approximate value of $414.7 million while, as of March 4, 2016, the PSA's interest in VRX

had declined to as low as $61.31 per share, representing a total value of under $97 million -- a

shocking loss in value of more than $300 million of the PSA's value from its approximate

high.  The investment of such a significant portion of the PSA's portfolio value in one security

was highly imprudent and an abject breach of fiduciary duty.

41.     In as early as 2012, published news reports questioned Valeant's business

model and accounting practices and, in 2013 and 2014, published news reports recounted that

short sellers were targeting VRX in light of its financial reporting practices and significant

uncertainty regarding the viability of its business model.  Such reporting continued into 2015

with well-regarded investors, including Charlie Munger, Berkshire Hathaway's Vice

Chairman, challenging the prudence of investing in Valeant.  Indeed, in 2015, Goldfarb and

Ruane were placed on specific notice that Valeant could not be trusted to report honestly

regarding its business practices.  Moreover, in 2015, two of the Sequoia Fund's Independent

Directors resigned based on concerns related to Ruane's investments in VRX. Despite all of these signs that the PSA's investments in Valeant should be substantially limited, Goldfarb and Ruane failed and refused to take any action to protect the Plan's participants.

42.    Contrary to the red flags and in the face of questioning by the Advisory Committee, Goldfarb and others at Ruane repeatedly trumpeted a bullish view of Valeant and rebuffed any suggestion of reducing the concentration of VRX in the PSA.

43.    In addition, the PSA was not, in fact, operated as a clone account of the Sequoia Fund and, in fact, astoundingly, held significantly higher concentrations of Valeant stock than the Sequoia Fund, a mutual fund that was marketed to high net-worth individuals and that, as a result of restrictions under the Investment Company Act of 1940 ("40 Act"), 15 U.S.C. §§ 80a-1–80a-64, was effectively prevented from holding over 25% of its investments in any one security. Thus, given the fact that the PSA was an ERISA-qualified fund, the breaches of duty by Goldfarb and Ruane -- in permitting greater concentration in a qualified retirement plan than in a non-diversified mutual fund that existed for the investments of high-net worth individuals -- is particularly egregious and shocks the conscience.

44.    Although the Advisory Committee took belated and limited actions to require Ruane to reduce the holdings in Valeant in 2015, Goldfarb and Ruane effectively ignored these requests and sold less than 1% of the PSA's holdings in VRX in September, 2015, at a time when Ruane could have sold significant shares of VRX and largely mitigated the losses suffered by the PSA. Instead, Goldfarb and Ruane failed to take any effective actions to reduce the enormous concentration of the PSA's assets in VRX and the concentration only again descended below 25% as a result of the stock's precipitous decline.

45.    Making matters even worse, it is highly unlikely that Ruane, as the PSA

investment manager, could sell its sizable Valeant holdings at the quoted price. That is because Ruane, in its role as the manager of the Sequoia Fund, was such an active participant in VRX, holding over 10% of Valeant stock in the Sequoia Fund alone -- not to mention RCG's other indirect holdings of VRX through separate accounts, such as the PSA. As a result of these holdings, Ruane operated in a conflicted position in which it had no effective means to reduce its sizeable holdings in Valeant without signaling to the market that it had lost confidence in the value of VRX -- a decision that any reasonable fiduciary acting in an unconflicted capacity would have taken without hesitation -- even if only to limit the concentration levels in VRX within the PSA to a prudent and reasonable level.

46.    Approximately one-third of all Plan assets were held in the PSA. Participants who were dependent upon these assets for their retirement security had no effective choice available to them but to endure the Valeant stock roller-coaster ride to which Goldfarb and Ruane committed them.

47.    Ruane was allowed to remain investment manager of the PSA until the summer of 2016 due, in large part, to a longstanding, symbiotic relationship between the Ruane and DST. Ruane was terminated as the PSA's investment manager on or about July 31, 2016, by which date the PSA's investments in VRX had been liquidated -- as had the losses suffered by the Plan as a result of the investments in VRX. By the time of its termination, Ruane was a battered investment manager, mired in litigation and plagued with redemptions, dismal performance and director resignations in the face of poor investment performance and the VRX investment debacle. Ruane made extreme departures from sound investment strategies with respect to the retirement assets contained in the PSA.

48.    Perversely, the PSA assets, which participants could not redeem, were used to

support the price of the Valeant stock in the Sequoia Fund, an open-end mutual fund from which investors could redeem their shares at any time.

49.    At all pertinent times, Ruane, as the investment adviser to the PSA, and Goldfarb, a principal of Ruane, were responsible for prudently investing the assets of the PSA in the sole interest of the Plan participants.  Goldfarb and Ruane breached their fiduciary duties by recklessly and imprudently investing the assets of the PSA in their own interest.

### ERISA'S FIDUCIARY STANDARDS

50.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan
> solely in the interest of the participants and beneficiaries and -
>
> (A)    for the exclusive purpose of
>
>     (i)    providing benefits to participants and their
>         beneficiaries; and
>     (ii)    defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)    with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a like
> capacity and familiar with such matters would use in the conduct
> of an enterprise of like character and with like aims.

51.    Under 29 U.S.C. 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer or investment advisor and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

52.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and

solely in the interest of participants in a plan.

53.    ERISA's fiduciary duties are "the highest known to the law" and must be

performed "with an eye single" to the interests of participants.

54.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29

U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a

breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in

relevant part, as follows:

> In addition to any liability which he may have under any other provision
> of this part, a fiduciary with respect to a plan shall be liable for a breach
> of fiduciary responsibility of another fiduciary with respect to the same
> plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly
> undertakes to conceal, an act or omission of such
> other fiduciary, knowing such act or omission is a
> breach; or
>
> (2)    if, by his failure to comply with section 404(a)(l) in
> the administration of his specific responsibilities
> which give risk to his status as a fiduciary, he has
> enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary,
> unless he makes reasonable efforts under the
> circumstances to remedy the breach.

55.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to

enforce a breaching fiduciary's liability to the plan under Section 409 of ERISA, 29 U.S.C. §

1109. Section 409(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of
> the responsibilities, obligations, or duties imposed upon fiduciaries by
> this subchapter shall be personally liable to make good to such plan any
> losses to the plan resulting from each such breach, and to restore to such
> plan any profits of such fiduciary which have been made through use of
> assets of the plan by the fiduciary, and shall be subject to such other
> equitable or remedial relief as the court may deem appropriate, including

removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

56.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to

bring an action individually, on behalf of the Plan, to enforce a breaching fiduciary's liability

to the Plan under 29 U.S.C. § 1109(a).

57.    In acting in this representative capacity and to enhance the due process

protections of unnamed participants and beneficiaries of the Plan, as an alternative to other

procedural protections they may employ if the proposed class is not certified for any reason,

Plaintiffs seek to certify this action as a class action on behalf of a class of similarly situated

plan participants and beneficiaries of the Plan.  Plaintiffs seek to certify, and to be appointed as

representatives of, the following class (the "Class"):

> All participants and beneficiaries of the DST Systems, Inc.
> 401(k) Profit Sharing Plan from March 14, 2010 through July
> 31, 2016 (the "Class Period"), excluding the Defendant and all
> other individuals who are or have ever been a member of the
> Advisory Committee of the DST Plan, the Compensation
> Committee of the Board of Directors of DST or otherwise served
> as fiduciaries of the DST Plan during the Class Period.[4]

58.    The action meets the requirements of Rule 23 and should be certified as a class

action for the following reasons:

a.    The Class includes more than 9,000 members and is so large that joinder of all its

members is impracticable;

b.    There are questions of law and fact common to the Class because Goldfarb owed

fiduciary duties to the Plan and all participants and beneficiaries, yet took the

---

[4]The plan of allocation to effectuate any proposed settlement of this action will prohibit recovery
by any members of the Class who are deemed to have already validly released their claims
against Mr. Goldfarb in any purported earlier settlement with Ruane.

actions and omissions alleged herein as to the Plan and not as to any individual

participant. Thus, common questions of law and fact including the following,

without limitation: to whom is Goldfarb liable for the remedies provided by 29

U.S.C. §1109(a); whether Goldfarb breached his fiduciary duties to the Plan; what

are the losses to the Plan resulting from each breach of fiduciary duty; and what

Plan-wide equitable and other relief the Court should impose in light of

Goldfarb's breaches of duty;

c.  Plaintiffs' claims are typical of the Class because Plaintiffs were participants

during the time period at issue in this action, and all participants in the Plan were

harmed by Defendants' misconduct;

d.  Plaintiffs are adequate representatives of the Class because they were participants

in the Plan during the Class period, have no interest that is in conflict with the

Class, are committed to the vigorous representation of the Class, and have

engaged experienced and competent attorneys to represent the Class; and

e.  Prosecution of separate actions for these breaches of fiduciary duties by

individual participants and beneficiaries would create the risk of: (A) inconsistent

or varying adjudications that would establish incompatible standards of conduct

for Defendants with respect to the discharge of their fiduciary duties to the Plan

and personal liability to the Plan under 29 U.S.C. §1109(a); and (B) adjudications

by individual participants and beneficiaries regarding these breaches of fiduciary

duties and remedies for the Plan would, as a practical matter, be dispositive of the

interests of the participants and beneficiaries not parties to the adjudication or

would substantially impair or impede those participants' and beneficiaries' ability

to protect their interests.

Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1).

59.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.

<u>**COUNT I**</u>
**(For Breach of Fiduciary Duty and Violation of ERISA's Prohibited Transaction Rules)**

60.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

61.     Defendant is a fiduciary of the Plan under ERISA, as explained above, and is a fiduciary based on the discretion, authority and/or control with respect to the administration, management and/or disposition of the Plan and its assets, and/or provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plan and Defendant's authority and responsibility with respect to the administration and management of the Plan and its retirement assets.

62.     Defendant provided investment advice for compensation with respect to the Plan, and/or used his discretionary authority and responsibility in the administration of the Plan to earn other compensation from self-dealing, as described above.

63.     Defendant is prohibited from receiving benefits in connection with his position as fiduciary of the Plan. At all pertinent times, Defendant violated his fiduciary duties of prudence, loyalty, diversification, and/or of monitoring under ERISA, as set forth herein.

64.     As detailed above, Defendant has engaged in severe breaches of fiduciary duty with respect to the investments in the PSA, in violation of ERISA § 404, 29 U.S.C. § 1104, by failing to (a) discharge his duties with respect to the Plan solely in the interest of the

participants and beneficiaries for the exclusive purpose of providing benefits to participants

and their beneficiaries, and defraying reasonable expenses of administering the Plan with the

care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of a like character and with like aims, (b) diversify the investments of the Plan so as

to minimize the risk of large losses, and (c) monitor the performance of other fiduciaries to the

Plan in a prudent and reasonable manner.

65.    As detailed above, Defendant has engaged in prohibited transactions in

violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plan

in his own interest or for his own account.

66.    As detailed above, Defendant has engaged in prohibited transactions in

violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), by acting on behalf of third parties

which have interests that are adverse to those interests of the Plan, its participants and/or

beneficiaries in connection with transactions involving the Plan.

67.    As detailed above, Defendant has engaged in and continues to engage in

prohibited transactions, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), by

receiving consideration for his own personal accounts from parties that deal with the Plan in

connection with transactions involving the assets of the Plan.

68.    Pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendant is

liable to the Plan to credit back, disgorge and/or make restitution of all improper compensation

received by him and is liable to the Plan to pay damages or make restitution to the Plan with

respect to the losses suffered by the Plan.

69.    Plaintiffs, on behalf of the Plan, are entitled to all equitable or remedial relief as

the Court may deem appropriate and just.

70.    Pursuant to ERISA § 502, 29 U.S.C. § 1132, Plaintiffs seek an Order declaring that the above-described practices of Defendants violate ERISA, as set forth above, and seek a permanent injunction preventing Goldfarb from engaging in such conduct in the future.

## COUNT II
### (For Breach Of Fiduciary Duty)

71.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

72.    Defendant's conduct, as set forth above, violates his fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A),(B) and (C), in that Defendant failed and continue to fail to discharge his duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and/or (c) by failing to diversify the investments of the Plan so as to minimize the risk of large losses.

73.    As a direct result of Defendant's breaches of duties, the Plan has suffered losses and damages.

74.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132, Defendant is liable to restore to the Plan the losses that have been suffered as a direct result of Defendant's breaches of fiduciary duty and is liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT III
### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

75.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

76.    In the alternative, to the extent that Defendant is not deemed a fiduciary or co-fiduciary under ERISA, Defendant is liable to the Plan for all recoverable damages and relief as a non-fiduciary that knowingly participated in a breach of trust.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class, and the Plan, demand judgment against Defendants, for the following relief:

(a)    Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)    Determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(c)    Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(d)    Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(e)    Attorneys' fees, costs and other recoverable expenses of litigation; and

(f)    Such further and additional relief to which Plaintiffs and the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all claims so triable.

26

## <u>NOTICE PURSUANT TO ERISA § 502(h)</u>

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h),

the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was

served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return

receipt requested.

Dated: August 31, 2020                    Respectfully submitted,

                                          SHEPHERD, FINKELMAN,
                                            MILLER & SHAH, LLP

                                          /s/ Laurie Rubinow
                                          James E. Miller
                                          Laurie Rubinow (Bar No. LR-6637)
                                          65 Main Street
                                          Chester, CT 06412
                                          Telephone: (860) 526-1100
                                          Facsimile: (866) 300-7367
                                          Email: jmiller@sfmslaw.com
                                                    lrubinow@sfmslaw.com

                                          Heidi A. Wendel
                                          SHEPHERD, FINKELMAN, MILLER
                                            & SHAH, LLP
                                          52 Duane Street, 7th Floor
                                          New York, NY 10007
                                          Telephone: (212) 419-0156
                                          Facsimile: (866) 300-7367
                                          Email: hwendel@sfmslaw.com

                                          Nathan C. Zipperian
                                          SHEPHERD, FINKELMAN, MILLER
                                            & SHAH, LLP
                                          1625 N. Commerce Parkway, Suite 320
                                          Fort Lauderdale, FL 33326
                                          Telephone: (954) 515-0123
                                          Facsimile: (866) 300-7367
                                          Email: nzipperian@sfmslaw.com

Ronald S. Kravitz
Kolin C. Tang
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
201 Filbert Street, Suite 201
San Francisco, CA 94111
Telephone: (415) 429-5272
Facsimile:  (866) 300-7367
Email: rkravitz@sfmslaw.com
           ktang@sfmslaw.com

James C. Shah
Alec J. Berin
SHEPHERD, FINKELMAN, MILLER
 & SHAH, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: jshah@sfmslaw.com
           aberin@sfmslaw.com

Monique Olivier
OLIVIER SCHREIBER & CHAO LLP
201 Filbert Street, Suite 201 San
Francisco, CA 94133
Telephone: (415) 484-0980
Email: monique@osclegal.com

*Attorneys for Plaintiffs and the Proposed Class*