Myron D. Rumeld (MR-3941)
Joseph E. Clark (5252440)
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL L. FERGUSON,<br>MYRL C. JEFFCOAT and DEBORAH SMITH,<br>individually and as representatives of a class of similarly<br>situated participants and beneficiaries, and on behalf of<br>the DST SYSTEMS, INC. 401(K) PROFIT<br>SHARING PLAN,<br><br>                              Plaintiffs,<br><br>              v.<br><br>ROBERT D. GOLDFARB,<br><br>                              Defendant. | Case No. 20-cv-7092-ALC<br><br>**BRIEF IN SUPPORT OF<br>APPROVAL OF<br>SETTLEMENT BETWEEN<br>DEFENDANT ROBERT<br>GOLDFARB AND<br>*FERGUSON* PLAINTIFFS** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..............................................................................................1

RELEVANT FACTS AND LEGAL CONSIDERATIONS..................................................2

RELATED PROCEEDINGS................................................................................................7

ARGUMENT.......................................................................................................................9

    I.  TO FACILITATE SETTLEMENT, THE COURT SHOULD ENTER AN
        INJUNCTION PROHIBITING ADDITIONAL CLAIMS AGAINST
        GOLDFARB BY THE DEFENDANTS IN THE PARALLEL PROCEEDINGS ............9

    II.  THE COURT SHOULD RULE THAT THE SETTLEMENT PRECLUDES
        ANY FURTHER CLAIMS FOR RELIEF BY THE SECRETARY OF LABOR...........13

CONCLUSION...................................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Alco Indus., Inc. v. Wachovia Corp.*,
   527 F. Supp. 2d 399 (E.D. Pa. 2007) ..............................................................4

*Barker v. Selway Corp.*,
   No. 18-cv-179, 2019 WL 109351 (D. Mont. Jan. 4, 2019) ..................................10

*Beck v. Levering*,
   947 F.2d 639 (2d Cir. 1991)..........................................................................15

*Bowles v. Reade*,
   198 F.3d 752 (9th Cir. 1999) ........................................................................14

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006)..........................................................................10

*Donovan v. Cunningham*,
   716 F.2d 1455 (5th Cir. 1983) ......................................................................15

*Dorman v. Charles Schwab Corp.*,
   780 F. App'x. 510 (9th Cir. 2019) ................................................................14

*Etter v. J. Pease Constr. Co.*,
   963 F.2d 1005 (7th Cir. 1992) ........................................................................4

*Federated Conservationists of Westchester Cnty., Inc. v. City of Yonkers*,
   117 F. Supp. 2d 371 (S.D.N.Y. 2000), *aff'd*, 26 F. App'x 84 (2d Cir. 2002)........12

*Gerber v. MTC Elec. Techs. Co.*,
   329 F.3d 297 (2d Cir. 2003)..................................................................10, 12

*Herman v. S.C. Nat'l Bank*,
   140 F.3d 1413 (11th Cir. 1998) ....................................................................15

*In re 2014 Radioshack ERISA Litig.*,
   No. 14-cv-959, 2016 WL 6561597 (N.D. Tex. Jan. 25, 2016) ............................10

*In re Baldwin-United Corp.*,
   770 F.2d 328 (2d Cir. 1985)..........................................................................11

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   228 F.R.D. 541 (S.D. Tex. 2005)..................................................................10

*In re HSBC Bank USA, N.A.*,
  98 A.D.3d 300 (4th Dep't 2012) ........................................................................................6

*In re JP Morgan Chase Bank*,
  27 Misc.3d 1205(A), 2010 WL 1340823 (N.Y. Surr. 2010), *aff'd sub nom.*
  *In re Hunter*, 100 A.D.3d 996 (2d Dep't 2012) ..............................................................4

*In re Masters Mates & Pilots Pension Plan*,
  957 F.2d 1020 (2d Cir. 1992) ............................................................................................9

*In re Munford, Inc.*,
  97 F.3d 449 (11th Cir. 1996) ...........................................................................................10

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) .......................................................................................13, 14

*In re WorldCom, Inc. ERISA Litig.*
  339 F. Supp. 2d 561 (S.D.N.Y. 2004) ...........................................................................9, 10

*Jacobs v. Verizon Commc'ns, Inc.*,
  No. 16-cv-1082, 2017 WL 8809714 (S.D.N.Y. Sept. 28, 2017) ......................................3

*Jones v. O'Higgins*,
  No. 87-cv-1002, 1989 WL 103035 (N.D.N.Y. Sept. 5, 1989) ..........................................4

*Lanka v. O'Higgins*,
  810 F. Supp. 379 (N.D.N.Y. 1992) ...................................................................................4

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
  552 U.S. 248 (2008) .........................................................................................................14

*Local 875 I.B.T. Pension Fund v. Pollack*,
  49 F. Supp. 2d 130 (E.D.N.Y. 1999) .........................................................................10, 12

*Neil v. Zell*,
  275 F.R.D. 256 (N.D. Ill. 2011) ......................................................................................14

*Pension Ben. Guar. Corp. ex. rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.*
  *Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) ..............................................................................................2

*Perez v. First Bankers Tr. Servs., Inc.*,
  No. 12-cv-8649, 2016 WL 2343889 (S.D.N.Y. May 3, 2016) ....................................10, 12

*Sandoval v. Simmons*,
  622 F. Supp. 1174 (C.D. Ill. 1985) ...................................................................................5

*Sec'y of Labor v. Fitzsimmons*,
    805 F.2d 682 (7th Cir. 1986) ................................................................15

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015) ....................................................................5

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977) ......................................................................11

*Wagner v. Stiefel Labs., Inc.*,
    No. 12-cv-3234, 2015 WL 4557686 (N.D. Ga. June 18, 2015)............................14

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    325 F. App'x 31 (2d Cir. 2009) ..........................................................5

**STATUTES**

28 U.S.C. § 1651 ..........................................................................11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 16(c) ......................................................................10

H.R Rep. No. 93-1280 (1974)................................................................15

Restatement (Third) of Trusts § 90 ........................................................16

## PRELIMINARY STATEMENT

Defendant Robert Goldfarb ("Goldfarb") has elected to make a settlement payment of $30.5 million (the "Settlement Payment"), in order to put behind him the events that have provoked the various lawsuits on behalf of participants of the DST Systems, Inc. 401(k) Profit Sharing Plan (the "Plan"). As a first step toward achieving that objective, and relatedly to putting millions of dollars in the hands of Plan participants, the Court is asked to preliminarily approve the terms of the settlement of the claims asserted against Goldfarb in this lawsuit (the "Settlement"). Consistent with the goal of achieving a "total peace" for Goldfarb in return for his substantial Settlement Payment, the Settlement is conditioned on the Court's approval of releases, and its issuance of an injunction, that will effectively remove the prospects of any collateral claims against him. This brief is offered for the purpose of supplementing the explanation provided by Plaintiffs as to why such relief is appropriate under the circumstances. Specifically, we explain below why:

1. The Settlement Payment in this action—particularly when coupled with the payment already made by Goldfarb to resolve the claims of participants who elected to pursue separate claims in arbitration and in parallel federal court proceedings[1]—represents a more than reasonable settlement of the claims against Goldfarb.

2. The parties to the parallel lawsuits and arbitrations should properly be enjoined from bringing collateral claims against Goldfarb.

---

[1] As reflected in the Settlement Agreement, these participants are included in the proposed Settlement Class and thus will receive additional monetary relief pursuant to this Settlement.

## RELEVANT FACTS AND LEGAL CONSIDERATIONS

Based on the pleadings and discovery taken in *Ferguson I*[2] and the related arbitration proceedings, and the deposition of Goldfarb taken by the Department of Labor ("DOL") in February 2017, there are known or undisputed facts that have a bearing on the merits of the claims asserted against Goldfarb, and that the Court should consider in evaluating the reasonableness of the proposed Settlement.

**First**, there is no dispute that the Plan benefitted greatly from its retention of Ruane, Cunniff and Goldfarb Inc. ("RCG"), the firm that Goldfarb managed for a period of time until 2016. From 1973, when RCG was first engaged by DST Systems, Inc. ("DST") as investment manager of the profit sharing portion of the Plan (the "PSP"), until June of 2016, the PSP averaged annualized returns of almost 13 percent, which far exceeded the returns of comparable stock indexes. (*See Scalia* Action, Dkt. 119 at 3.)[3] Even during the period following the PSP's investment in Valeant Pharmaceuticals International Inc. ("Valeant")—the investment that is the subject of this lawsuit—the PSP experienced very strong performance, accumulating a 60 percent return from the Valeant investment alone. (*See Scalia* Action, Dkt. 118 at 6-7; Dkt. 119 at 3.) Indeed, the only way to concoct an adverse experience for the Plan participants arising from the Plan's retention of RCG is by banking all of the positive returns generated by RCG and then assuming that Valeant stock should have been sold when the stock had already appreciated significantly, and before the price declined. The failure to display such clairvoyance is not the basis for finding a fiduciary breach under ERISA. *See, e.g.*, *Pension Ben. Guar. Corp. ex. rel. St.*

---

[2] "*Ferguson I*" refers to *Ferguson. v. Ruane, Cunniff & Goldfarb, Inc.*, S.D.N.Y. Case No. 17-cv-6685, a case in which Goldfarb is not a party.

[3] The "*Scalia* Action" refers to *Scalia v. Ruane, Cunniff & Goldfarb Inc.*, S.D.N.Y. Case No. 19-cv-9302.

*Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) ("[W]e judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight") (internal quotation omitted); *Jacobs v. Verizon Commc'ns, Inc.*, No. 16-cv-1082, 2017 WL 8809714, at *6 (S.D.N.Y. Sept. 28, 2017) ("[A] plaintiff must allege sufficient nonconclusory factual content raising a plausible inference of misconduct [that] does not rely on the vantage point of hindsight") (internal quotation omitted).

**Second**, the investment strategy deployed by RCG to achieve such favorable results was no secret. RCG explicitly disclosed to its clients—including DST—that it "focuses its investments on a limited number of issuers and does not seek to diversify investments among types of securities, countries or industry sectors" and that, consequently, "client portfolios are subject to more rapid change in value than would be the case if [RCG] were to maintain a wider diversification . . . ." (*See Scalia* Action, Dkt. 1 ¶ 35.) RCG also disclosed that it employed "a buy and hold investment strategy wherein [RCG] acquires securities for its clients and holds them for relatively longer periods of time, regardless of short-term factors such as fluctuations in the market or volatility of the stock price."[4] Finally, the monthly portfolio status reports provided by RCG to DST made clear that the PSP consistently held only two to three dozen stocks, and that over time—as a result of price increases—certain PSP holdings exceeded 10 percent of the PSP portfolio. (*See, e.g.*, *Scalia* Action, Dkt. 121 ¶¶ 4-5; Dkt. 121-02 at RCGKC0001572; Dkt. 121-03 at RCGKC0001615.) While the consistent disclosure by RCG of its investment strategy could conceivably call into question the prudence of the decisions by the

---

[4] *See, e.g.*, Ruane, Cunniff & Goldfarb L.P., *Form ADV*, Part 2A at 6 (Mar. 23, 2020), ruanecunniff.com/d/?RP9X2Z.

Advisory Committee of the Plan ("Advisory Committee") to continue to allocate all of the PSP's assets to RCG's management, it strongly militates against a finding that RCG or Goldfarb breached any duty to diversify the Plan.  *See, e.g.*, *Etter v. J. Pease Constr. Co.*, 963 F.2d 1005, 1010-11 (7th Cir. 1992) (investment of almost 90 percent of a plan's assets in one real estate investment was prudent where trustees "knew and understood the local real-estate market"); *Lanka v. O'Higgins*, 810 F. Supp. 379, 389 (N.D.N.Y. 1992) (where plaintiffs "purposefully and deliberately selected the defendant as their investment manager being intimately familiar with his philosophy of investment management," portfolio invested in just three stocks, while not diverse, was not managed imprudently); *Jones v. O'Higgins*, No. 87-cv-1002, 1989 WL 103035, at *7-8 (N.D.N.Y. Sept. 5, 1989) (concluding that, although plaintiff established prima facie case of non-diversification, defendant "carried his burden of showing that the highly concentrated investments here were prudent and did not violate ERISA's diversification requirement" as defendant "offered convincing evidence that his contrarian investment strategy was within industry standards," was "in conformity with the practice in the investment industry," and "was pursued on behalf of an approving client"); *Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 412 (E.D. Pa. 2007) (denying summary judgment for plaintiffs who claimed that equity portfolio manager improperly pursued undiversified strategy, and noting that, at trial, court would evaluate plan fiduciary's knowledge of the strategy and plan purpose); *see also In re JP Morgan Chase Bank*, 27 Misc.3d 1205(A), 2010 WL 1340823, at *6 (N.Y. Surr. 2010) (explaining that diversification duty "allows leeway for the fiduciary to opt out if the

beneficiaries require otherwise or if the testator/settlor directed a different course of action"), *aff'd sub nom. In re Hunter*, 100 A.D.3d 996 (2d Dep't 2012).[5]

**Third**, in addition to the PSP, the Plan also consisted of a participant-directed account component, comprising approximately 50% of the Plan's total assets. (*See Scalia* Action, Dkt. 118 at 4.)  The presence of these holdings effectively diluted the holdings managed by RCG, thus militating against any argument that the Plan as a whole was not diversified.  *See, e.g., Young v. Gen. Motors Inv. Mgmt. Corp*., 325 F. App'x 31, 33 (2d Cir. 2009) (summary order) (affirming dismissal of claim alleging breach stemming from failure to diversify specific plan funds absent allegations that plan was undiversified as a whole); *Sandoval v. Simmons*, 622 F. Supp. 1174, 1211 (C.D. Ill. 1985) ("ERISA measures diversification by considering the assets of the trust as a whole, not by the assets of particular funds.  Accordingly, the diversification of [the fiduciary's] investments on behalf of the [pension trust] must be evaluated by considering all the assets of that Trust.").

**Fourth**, the increased concentration of Valeant shares in the PSP portfolio, which is the crux of this lawsuit, arose exclusively due to Valeant's enormous price appreciation.  (*See Scalia* Action, Dkt. 118 at 6; Dkt. 119 at 8.)  RCG did not purchase a single additional share of Valeant stock for the PSP after the initial purchases of the stock in 2010.  (*See Scalia* Action, Dkt. 118 at 6; Dkt. 119 at 8.)  Requiring RCG to sell these shares merely for the sake of "rebalancing," even though RCG's research indicated the shares were still undervalued, would have directly contravened RCG's investment strategy – the same strategy that had generated huge returns for

---

[5] The United States Supreme Court has looked to state trust law principles, including those embodied in the Restatement (Third) of Trusts § 90, to determine the parameters of ERISA's fiduciary duties with respect to investments.  *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).

the Plan and other clients for many years, and for which the Advisory Committee engaged and
retained RCG.  It also would have run contrary to trust law principles, which decline to require
diversification where an investment becomes overweight "organically," *i.e.*, through growth,
rather than fresh purchases.  *See In re HSBC Bank USA, N.A.*, 98 A.D.3d 300, 316-17 (4th Dep't
2012) (ruling that trustee acted prudently in holding overweight concentrations of stock, where
overweight position occurred solely because of numerous stock distributions and stock had been
retained upon advice of investment-savvy beneficiary).

     **Fifth**, although in late August 2015, the Advisory Committee for the first time set limits
on the concentration of PSP assets, it did so in a manner that left RCG with broad discretion as to
the timing and manner of reducing the concentration of existing PSP holdings that already
exceeded the concentration limit, *i.e.*, Valeant.  (*See Scalia* Action, Dkt. 118 at 13 n.8; Dkt. 119
at 19-20.)  Specifically, the Advisory Committee "ask[ed]" Goldfarb, as the portfolio manager,
to "exercise [his] best judgment in reducing the Valeant concentration taking into account
suitable investment alternatives, execution and timing of sales, and other market conditions, in
the best interests of the Plan's participants," and to implement the instructions "on a time frame
that he believe[d would] be practicable and prudent."  (*See Scalia* Action, Dkt. 119 at 20.)
Goldfarb responded to this request by lowering the targeted "sell" price for Valeant shares held
by the PSP, and by planning to gradually implement sales as that price was reached.  (*See id.* at
20-21.)  As it turned out, however, the price of Valeant stock did not reach the targeted level, but
rather declined significantly over the ensuing two months, such that by the end of October the
PSP's Valeant holding was below the 25% concentration limit without RCG having to make
significant sales.  (*Scalia* Action, Dkt. 119 at 20-21; Dkt. 121 ¶ 6; Dkt. 121-4 at 1-4.)

**Sixth**, notwithstanding some of the public criticism about Valeant that precipitated a decline in the stock price in the fall of 2015, RCG's research indicated that the stock still presented opportunities for substantial growth. That view was shared by several other investors and analysts, who continued to be strong proponents of the stock.

In short, Goldfarb and RCG managed the PSP's investments prudently and in accordance with the investment philosophy for which RCG was engaged. The Advisory Committee could have limited the amount of assets allocated to RCG for investment, or the manner in which these investments were managed, but elected not to; and when it finally instituted a concentration cap, it did so in a manner that left Goldfarb with complete discretion over how to implement that cap – discretion that Goldfarb exercised appropriately, and consistently with the investment philosophy that RCG espoused and for which the firm was retained. These are not circumstances that would justify a finding of fiduciary breach against RCG or Goldfarb.

## RELATED PROCEEDINGS

This is the second lawsuit in which Mr. Goldfarb has been named a defendant. He is also a defendant, together with several DST Defendants[6] and RCG, in a lawsuit brought in October 2019 by the Secretary of the U.S. Department of Labor (the "Secretary") captioned *Scalia v. Ruane, Cunniff & Goldfarb Inc.*, S.D.N.Y. Case No. 19-cv-9302-ALC.[7] There have been no proceedings in the *Scalia* Action other than the briefing of motions to dismiss the Complaint, which is still in progress.

---

[6] "DST Defendants" means: (i) DST; (ii) the Advisory Committee and certain of its individual members; and (iii) the Compensation Committee of the Board of Directors of DST Systems, Inc. and certain of its individual members.

[7] More recently, Goldfarb was named as a co-defendant in a Complaint filed against him by the DST Defendants asserting, *inter alia*, claims for contribution or indemnity arising from claims asserted against DST in the arbitration proceedings. *See* S.D.N.Y. Case No. 20-cv-9472.

Goldfarb is not named as a defendant in the various other lawsuits filed on behalf of Plan participants. Nor was he named as a respondent in the nearly 500 individual arbitrations that were filed against RCG and the DST Defendants. Goldfarb nevertheless funded a settlement of the claims asserted against RCG in these arbitrations, as well as the *Canfield* and *Mendon* Actions, in return for releases that extended to him as well as RCG, and provisions that were intended to bar third-party claims against him by the DST Defendants.[8]

Although the claims asserted in the more recently filed *Scalia* Action and the other, earlier filed proceedings all arise from RCG's management of Plan assets, there are material differences among these lawsuits. The other suits are directed principally at the alleged failure of RCG to rebalance the PSP's portfolio after the percentage holdings in Valeant stock increased due to price appreciation, and the DST Defendants' alleged failure to direct RCG with respect to these holdings. The Secretary claims, however, that it was inherently imprudent for RCG to manage all of the PSP's assets because of RCG's investment strategy. Specifically, the Secretary alleges that RCG and Goldfarb "failed to protect the Plan and its participants and beneficiaries' interests" by applying RCG's "non-diversified" investment strategy to "100% of the PSP's assets." (*Scalia* Action, Dkt. 1 ¶ 57). The Secretary's Complaint is devoid of any explanation, however, as to why responsibility for retaining RCG to manage the PSP's assets in this fashion should rest with Goldfarb and RCG, rather than the named fiduciaries of the Plan. In addition, as discussed in detail in motions to dismiss filed by Goldfarb and the other defendants, in pursuing

---

[8] The "*Canfield* and *Mendon* Actions" means (i) *Canfield v. SS&C Techs. Holdings, Inc.*, S.D.N.Y. Case No. 18-cv-8913 and (ii) *Mendon v. SS&C Techs. Holdings, Inc.*, S.D.N.Y. Case No. 18-cv-10252. "*Canfield*/*Mendon* Plaintiffs" refers to the individual plaintiffs in the *Canfield* and *Mendon* Actions.

this theory of liability and damages the Secretary confronts unique statute of limitations

defenses, since the challenged relationship between the Plan and RCG dates back to the 1970s.

## ARGUMENT

## I.

## TO FACILITATE SETTLEMENT, THE COURT SHOULD ENTER AN INJUNCTION PROHIBITING ADDITIONAL CLAIMS AGAINST GOLDFARB BY THE DEFENDANTS IN THE PARALLEL PROCEEDINGS

A necessary and understandable condition for the Settlement is that, in return for the

sizable payment that Mr. Goldfarb is making, he receive protection against additional claims for

relief arising from Plan investments.  As discussed more fully below, the proposed injunction

would remove a serious potential obstacle to achieving settlement in that it addresses Mr.

Goldfarb's concern that he may later be faced with claims for indemnity or contribution, or other

claims concerning or arising from the claims released under the proposed Settlement.  Indeed,

without such an order, Mr. Goldfarb has little incentive to enter into a settlement.  *See In re*

*Masters Mates & Pilots Pension Plan*, 957 F.2d 1020, 1028 (2d Cir. 1992) ("If a nonsettling

defendant against whom a judgment ha[s] been entered were allowed to seek payment from a

defendant who had settled, then settlement would not bring the latter much peace of mind . . .

*This potential liability would surely diminish the incentive to settle.*") (emphasis added); *In re*

*WorldCom, Inc. ERISA Litig*. 339 F. Supp. 2d 561, 568 (S.D.N.Y. 2004) ("Without the ability to

limit the liability of settling defendants through bar orders, 'it is likely that no settlements could

be reached.'") (citation omitted).

The proposed injunction would effectively operate as a bar order against the DST

Defendants and RCG, with the only difference being that the barred parties are not co-defendants

in this action, but rather are defendants in parallel proceedings in which the same or similar

claims are asserted arising from the same Plan investments.  A federal court's authority to enter a

bar order derives from multiple sources, including Federal Rule of Civil Procedure 16, which acknowledges that federal courts have a strong interest in facilitating settlement before trial: "Since it obviously eases crowded court dockets and results in savings to the litigants and the judicial system, settlement should be facilitated at as early a stage of the litigation as possible." Fed. R. Civ. P. 16(c) Advisory Committee Note.

There is ample authority in ERISA cases and elsewhere for entering appropriate bar orders to facilitate partial settlements where, as here, the settlement is reasonable and in the interests of the plan participants. *See, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 273-74 (2d Cir. 2006) (approving bar order prohibiting claims by non-settling defendants); *Gerber v. MTC Elec. Techs. Co.*, 329 F.3d 297, 307-08 (2d Cir. 2003) (same); *Perez v. First Bankers Tr. Servs., Inc.*, No. 12-cv-8649, 2016 WL 2343889, at *2-3 (S.D.N.Y. May 3, 2016) (approving bar order in ERISA case against non-settling defendant); *In re WorldCom, Inc. ERISA Litig.*, 339 F. Supp. 2d at 564-66, 570-72 (same); *Local 875 I.B.T. Pension Fund v. Pollack*, 49 F. Supp. 2d 130, 132-33 (E.D.N.Y. 1999) (entering bar order against non-settling defendants); *In re Munford, Inc.*, 97 F.3d 449, 454-56 (11th Cir. 1996) (approving bar order prohibiting claims by non-settling defendants); *Barker v. Selway Corp.*, No. 18-cv-179, 2019 WL 109351, at *2 (D. Mont. Jan. 4, 2019) (approving bar order against any "past or present participant or beneficiary" of Employee Stock Ownership Plan); *In re 2014 Radioshack ERISA Litig.*, No. 14-cv-959, 2016 WL 6561597, at *2-3 (N.D. Tex. Jan. 25, 2016) (approving bar order in ERISA case against non-settling defendants); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 228 F.R.D. 541, 563-67 (S.D. Tex. 2005) (same).

The fact that the bar order here will take the form of an injunction against defendants in parallel proceedings should not deter this Court from approving the Settlement. The requested

relief is consistent with the All-Writs Act, which allows district courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

As the Second Circuit has observed:

> An important feature of the All-Writs Act is its grant of authority to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction.
>
> * * *
>
> The power to bind non-parties distinguishes injunctions issued under the Act from injunctions issued in situations in which the activities of the third parties do not interfere with the very conduct of the proceeding before the court.

*In re Baldwin-United Corp.*, 770 F.2d 328, 338 (2d Cir. 1985); *see also United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977) (concluding that the power conferred by the All-Writs Act extends to nonparties who "are in a position to frustrate the implementation of a court order or the proper administration of justice"). The *Baldwin-United* court held that the requirements of the All-Writs Act are satisfied "if the parties whose conduct is enjoined have actual notice of the injunction and an opportunity to seek relief from it in the district court." *In re Baldwin-United*, 770 F.2d at 340.

Accordingly, courts have invoked the All-Writs Act to prevent both non-settling parties and third parties from pursuing claims that would be duplicative of the damages or claims resolved, and/or thwart the parties' ability to effect a reasonable settlement. *See, e.g, In re Baldwin-United*, 770 F.2d at 335-340 (invoking all-writs act to enjoin "state officials from bringing actions in a de facto or de jure representative capacity on behalf of [private] plaintiffs in . . . federal actions"); *Federated Conservationists of Westchester Cnty., Inc. v. City of Yonkers*, 117 F. Supp. 2d 371, 384-85 (S.D.N.Y. 2000) (invoking all-writs act to enjoin "plaintiffs, their

successors and assigns" from bringing "repetitious actions" regarding the same claims because finality was needed to effect settlement), *aff'd*, 26 F. App'x 84 (2d Cir. 2002).

As applied here, the injunction would expressly bar claims for contribution or indemnity arising from judgments against the DST Defendants or RCG in the parallel federal court and arbitration proceedings. To protect against any potential harm to the DST Defendants and RCG, and consistent with applicable authority, the Settlement Agreement is conditioned on the Court's entry of a judgment credit, in all the parallel proceedings, in an amount equal to the greater of: (i) each individual's recovery from the Settlement (plus any recovery received in the arbitration proceedings); or (ii) Goldfarb's proportionate/percentage share of liability vis-à-vis other potentially responsible parties that, were it not for the bar, could assert third-party claims against Goldfarb.[9] *See, e.g.*, *Gerber*, 329 F.3d at 303 ("By awarding a credit that is at least the settling defendants' proven share of liability, the non-settling defendants' rights are protected even without a determination of the fairness of the settlement."); *First Bankers Tr. Servs.*, 2016 WL 2343889, at *2-3 (approving similar bar order because it "prevent[ed] potential unfair treatment by giving [non-settling ERISA defendant] the benefit of the amount paid by [settling defendant] in settlement" and ensured that non-settling defendant would "not pay more than its proportionate share of liability"); *Pollack*, 49 F. Supp. 2d at 133 ("The judgment reduction provision in the Bar Orders proposed here adequately protects the non-settling defendants because it provides them the 'greater of' the pro tanto and the proportionate share methods.").

---

[9] In the event the Settlement is not approved, Goldfarb reserves the right to seek dismissal of the DST Defendants' contribution/indemnity claims on the grounds that they are not viable.

In short, by approving the Settlement, the Court will protect Goldfarb from any further litigation arising from his involvement with the PSP, without prejudice to the parties that might otherwise wish to pursue claims against him.

## II.

### THE COURT SHOULD RULE THAT THE SETTLEMENT PRECLUDES ANY FURTHER CLAIMS FOR RELIEF BY THE SECRETARY OF LABOR

In order for this matter to be resolved, Goldfarb must also be protected from claims asserted by the Secretary. It is hoped that, in light of the size of the Settlement Payment—and Goldfarb's prior payment to resolve the claims by the arbitration claimants and *Canfield* and *Mendon* Plaintiffs—the Secretary will approve of the Settlement, and simply dismiss his claims against Goldfarb. But if not, the Court is urged to enter an injunction precluding the Secretary from seeking additional relief for the Plan and its participants, so as to facilitate the substantial recovery for the benefit of the Plan and its participants that is presented by this Settlement. The fact that the claims asserted by the Secretary are in some respects different from the claims asserted in this lawsuit and the parallel proceedings—insofar as they are based on the allegedly imprudent nature of the Plan's retention of RCG, and its decision to adopt and implement RCG's investment strategy—should not alter this conclusion. To the contrary, this only strengthens the arguments militating in favor of an injunction, since the Secretary's claims are vulnerable to dismissal.

To begin with, although the Secretary may independently have standing to bring claims for breach of fiduciary duty, he cannot recover monetary relief for participants who have independently elected to release their claims. *See, e.g.*, *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 600 (3d Cir. 2009) (holding that while execution of individual release did not prevent plaintiff from bringing an ERISA Section 502(a)(2) claim on behalf of the plan, it

13

raised concerns as to her ability to adequately serve as a lead plaintiff as the release likely left her with no "monetary stake in the outcome"); *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir. 1999) (holding that plaintiff could not release the plan's claims under Section 502(a)(2) but that she could release the claims she could have "legally brought" individually); *Neil v. Zell*, 275 F.R.D. 256, 261 (N.D. Ill. 2011) (citing to *Schering Plough* for the proposition that those who sign releases may not have a "monetary stake" in a Section 502(a)(2) action brought on behalf of the plan, and noting that if individual class members signed releases it "would serve to whittle down the defined class"); *Wagner v. Stiefel Labs., Inc.*, No. 12-cv-3234, 2015 WL 4557686, at *11 (N.D. Ga. June 18, 2015) (citing to *Schering Plough* for the proposition that individuals who signed releases may have extinguished their "monetary stake" in a Section 502(a)(2) action). This is particularly true in cases involving defined contribution plans, like the Plan, because these suits seek monetary relief for each individual participant in the plan for the losses associated with his or her individual account. *See, e.g.*, *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 262 (2008) (Thomas, J concurring) ("[W]hen a defined contribution plan sustains losses, those losses are reflected in the balances in the plan accounts of the affected participants, and a recovery of those losses would be allocated to one or more individual accounts."); *Dorman v. Charles Schwab Corp.*, 780 F. App'x. 510, 514 (9th Cir. 2019) ("Although § 502(a)(2) claims seek relief on behalf of a plan, the Supreme Court has recognized that such claims are inherently individualized when brought in the context of a defined contribution plan like that at issue.") (citing *LaRue*). Thus, if, pursuant to this Settlement and the related settlements with the arbitration claimants and the *Canfield/Mendon* Plaintiffs, all participants will have released their individual claims for relief against Goldfarb, and the Plan

has likewise released its claims, no additional monetary relief can be brought on their behalf by the Secretary.[10]

Second, there is a strong likelihood that the purported grounds by which the Secretary would seek to recover additional monetary relief, over and above the Settlement Payment, will fail, since: (i) the Secretary's Complaint will likely be found to be time-barred, in whole or substantial part, for the reasons already stated in the motions to dismiss filed in the *Scalia* Action; and (ii) there is a substantial likelihood that, on the merits, the Secretary's unique theory of liability will not succeed vis-à-vis Goldfarb.

There are several flaws in the Secretary's theory of liability, including:

- DST alone, and not RCG or Goldfarb, bore the responsibility for determining whether to retain investment managers to manage Plan assets, and if so what percentage of Plan assets to allocate to each investment manager.  RCG and Goldfarb's responsibilities were limited to prudent management of the PSP assets that DST retained RCG to manage.

- As the Secretary ultimately recognized (*Scalia* Action, Dkt. 88 at 2), he cannot allege that RCG's investment strategy was *per se* improper for the PSP or for other ERISA clients. H.R Rep. No. 93-1280, at 304 (1974) (Conf. Rep.) ("the degree of investment concentration that would violate the requirement to diversify cannot be stated as a fixed percentage because a prudent fiduciary must consider the facts and circumstances of each

---

[10] The cases previously cited by the Secretary (*see RCG v. Payne*, No. 19-cv-11297 (S.D.N.Y. Jan. 24, 2020), Dkt. 40 at 6-9), for the position that he retains the right to seek additional monetary relief are distinguishable because in those cases the adequacy of the relief obtained by private litigants was in question.  *See Beck v. Levering*, 947 F.2d 639, 642 (2d Cir. 1991) (per curiam) (permitting the Secretary to pursue additional restitutionary relief where earlier recovery was obtained by the plan's trustee, since "trustees may be faced with potential liability and their interest in absolving themselves may conflict with the private litigants' interest in fair adjudication of the issues and full recovery"); *Herman v. S.C. Nat'l Bank*, 140 F.3d 1413, 1417 (11th Cir. 1998) (recognizing the Secretary's right to pursue claims against defendants that were not required to make monetary contribution to prior settlement with private litigants); *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697-99 & n.7 (7th Cir. 1986) (recognizing the Secretary's right to pursue concurrent claims where a conflict amongst the settlement class called into question adequacy of representation, and where the settlement failed to recover from the personal assets of individual trustees).  *See also Donovan v. Cunningham*, 716 F.2d 1455, 1461, 1462 & n.10 (5th Cir. 1983) (permitting the Secretary to pursue claims for injunctive relief, but declining to address whether the Secretary could pursue additional monetary relief following earlier settlement).

case"). ERISA permits plans to invest in concentrated investment strategies such as the one offered by RCG. *See*, *e.g.*, Restatement (Third) of Trusts § 90, Comment g ("given the variety of defensible investment strategies . . . diversification concerns do not necessarily preclude an asset-allocation plan that emphasizes a single category of investments . . . .").

- Contrary to the Secretary's characterization, the PSP portfolio in fact was diversified, as it consisted of two to three dozen stocks that were diversified across more than fifteen different industry sectors; and that portfolio comprised only half of the total Plan assets.

In short, the Secretary's claims are likely to be found to be time-barred or unsustainable on the merits. Accordingly, the participants' interests will not be served if the Court were to preserve these claims and, in so doing, foreclose the opportunity for the participants to partake in a generous settlement of the claims against Goldfarb.

## **CONCLUSION**

For the foregoing reasons, the Court should issue its approval of the Settlement.

Dated: January 13, 2021                              Respectfully submitted,


By:        */s/ Myron D. Rumeld*

                                                                Myron D. Rumeld

Myron D. Rumeld
Joseph E. Clark
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
Tel: (212) 969-3000
Fax: (212) 969-2900
mrumeld@proskauer.com
jclark@proskauer.com

*Attorneys for Defendant*